**Ivan SCOTT, Plaintiff,**

v.

**GARCIA, Warden, Centinela State Prison, et al. Defendants.**

**No. CIV. 00–1849 WQHJMA.**

United States District Court,
S.D. California.

Jan. 4, 2005.

Mazda K. Antia and Chaise R. Bivin, Cooley Godward LLP, for plaintiff.

Randall A. Pinal, Deputy Attorney General, California Attorney General's Office, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 113]

HAYES, District Judge.

## I.

### Procedural Background

This matter comes before the Court on Defendants' Motion for Summary Judgment pursuant to FED.R.CIV.P. 56 [Doc. No. 113].

The Court has considered the papers filed in support of Defendants' motion, Plaintiff's Opposition, Defendants' Reply, as well as all relevant pleadings and documents in the Court's file. For the following reasons, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion.

## II.

### Procedural History

Before the Court is Plaintiff Ivan Scott's Second Amended Complaint ("SAC"), filed pursuant to the Civil Rights Act, 42 U.S.C. § 1983 and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") [Doc. No. 72]. On June 21, 2004, Defendants filed a Motion for Summary Judgment [Doc. No. 113]. Thereafter, Plaintiff filed his Opposition [Doc. No. 119], to which Defendants have Replied [Doc. No. 124]. While this case was randomly referred to the Honorable Magistrate Judge Jan M. Adler pursuant to 28 U.S.C. § 636(b)(1)(B) for disposition, the Court has determined that a Report and Recommendation regarding the disposition of Defendants' pending Motion for Summary Judgment is unnecessary. *See* S.D. CAL. CIVLR 72.3(a) (assigning "[a]ll of the District's civil § 1983 prisoner caseload" to the District's magistrate judges for disposition either upon consent of all parties, or in absence of unanimous written consent, "upon submission of proposed findings and recommendations to the district judge, unless the district judge orders otherwise."). This matter has been submitted on the papers for determination without oral argument pursuant to S.D. CAL. CIVLR 7.1.d.1.

## III.

### Factual Allegations

Plaintiff was a state prisoner incarcerated at the High Desert State Prison in Susanville, California.[1] From February 25, 1998 to April 12, 1999, Plaintiff was incarcerated at Centinela State Prison ("Centinela") where he began experiencing stomach and digestive problems. *See* SAC

---

1. According to Plaintiff's Opposition, he is currently incarcerated at the West Valley Detention Center in Rancho Cucamonga, California.

at ¶ 17; Defs.' Ex. B, Plaintiff's CDC Chronological History. Plaintiff often suffered digestive problems, including vomiting, gastrointestinal distress and the inability to eat regular prison food. *See* Pl.'s Exs. D–N, Plaintiff's CDC Medical File.[2] On October 7, 1998, Plaintiff was examined by Dr. Mustafa Hamdy, a gastroenterologist. Dr. Hamdy diagnosed Plaintiff with esophageal erosion, possible Barrett's esophagus, multiple gastric erosions, gastic ulcer, pyloric channel ulcer, duodenal bulb ulcer and multiple second duodenum ulcers. *See* Defs.' Ex. W, Dr. Hamdy's Medical Report dated October 7, 1998. Plaintiff was prescribed an anti-reflux medication and instructed to avoid fatty and spicy foods by Dr. Hamdy. *Id.* Plaintiff brought his dietary needs to the attention of Centinela staff and requested food which followed Dr. Hamdy's instructions. *See* Plaintiff's Stmt. of Undisputed Facts ("SOF") No. 6; Pl.'s Ex. A, Deposition of Plaintiff at 52:25–53:4, 104:3–11, 106:2–17, 101:10–18, 102:9–11.

The following month, Centinela's Chief Medical Officer, Charles Pickett, documented Plaintiff's medical condition in a 128–C medical "chrono" which indicated that Plaintiff "needs a transfer to an institution with a medical hospital facilities" because of his "moderate to severe erosion of the gastric mucosa and esophageal erosion from reflux, due to a hiatal hernia." *See* Pl.'s Ex. Q, medical chrono dated November 4, 1998; *see also* Defs.' Ex. AB. This chrono was placed in Plaintiff's central file. *Id.;* Defs.' SOF No. 32.

Two days later, on November 6, 1998, Plaintiff appeared before an institutional classification committee hearing. *See* Defs.' Ex. AD, Classification Chrono dated Nov. 6, 1998. During the hearing, Plaintiff informed Defendants Asuncion and Esquibel of his need to transfer to an institution with a medical hospital pursuant to Dr. Pickett's chrono. *Id.* The classification chrono indicates that Asuncion and Esquibel did not affirmatively recommend transfer but instead chose to "refer" Plaintiff's request to the classification staff representative ("CSR").[3]

On December 9, 1998, Plaintiff was once again examined by Dr. Hamdy. *See* Defs.' Ex. AF, Dr. Hamdy's Medical Report dated Dec. 9, 1998. As a result of this examination, Dr. Hamdy diagnosed Plaintiff with mild esophagitis, small red tongue of red mucosa in the lower esophagus, markedly improved esophagus, persistent gastric ulcer, persistent duodenal ulcer and pyloric channel ulcer. The report noted that Plaintiff informed Dr. Hamdy that he "cannot eat persistent of abdominal pain and losing weight." Dr. Hamdy recommended that a CT scan of Plaintiff's abdomen be performed. *Id.*

Due to disciplinary infractions, Plaintiff was sentenced to a nine month "SHU"[4] term. *See* Defs.' Ex. AN, classification chrono dated February 11, 1999. Defendant Holmstrom, a Correctional Counselor III in the Health Care Placement Unit, was contacted by Peggy Noroit, the Utilization Management Nurse at Centinela, on January 19, 1999, regarding Plaintiff's

---

**2.** Defendants have informed the Court that the parties have stipulated that all records from Plaintiff's CDC files are authentic. *See* Defs.' First Amended Separate Statement of Undisputed Facts at 1.

**3.** Defendants claim in their Separate Statement of Undisputed Facts that Asuncion and Esquibel "recommended Plaintiff be transferred to Corcoran pursuant to Dr. Pickett's

November 4, 1998 chrono." For this assertion, Defendants cite to the classification chrono dated November 6, 1998. *See* Defs.' Ex. AD. However, the Court has reviewed this document and it does not appear as though any such recommendation was made during this classification hearing.

**4.** "Secured Housing Unit"

medical condition and housing needs. *See* Defs.' Ex. I, Declaration of Christine Holmstrom at ¶ 7; Defs.' Ex. AL, Health Care Population Management Unit Contact Sheet. Defendant Holmstrom was contacted for a recommendation regarding placement for Plaintiff because Centinela staff believed that Plaintiff "needed to be at an institution that had an on-site acute care hospital." *See* Defs.' Ex. AC, Deposition of Christine Holmstrom at 52:12–21. Centinela State Prison does not have an on-site acute care hospital. *Id.* On January 22, 1999, Holmstrom consulted with Dr. Calvo, a Chief Medical Officer in Health Care Services Division in Sacramento, who indicated that Plaintiff did not need to be placed in a hospital because "an outpatient facility would be sufficient." Defs.' Ex. I, Holmstrom Decl. at ¶ 8. There is no statement by Dr. Calvo to explain the basis for his opinion that Plaintiff did not need to be placed in an acute care hospital. There is no evidence that Dr. Calvo examined Plaintiff or reviewed Plaintiff's medical records in coming to this opinion. Ultimately, Holmstrom recommended that Plaintiff be transferred to Corcoran for his SHU term.

When Plaintiff was given a nine month SHU term on February 11, 1999, the classification committee members, Asuncion, Dubenspeck, Alkire, Valenzuela, Snead, Ferra, Gile and Stanifer retained Plaintiff at Centinela "pending review" for placement at Pelican Bay or Corcoran. *See* Defs.' Ex. AN. On February 24, 1999, Dr. Pickett issued another medical chrono in which he stated that "[Plaintiff] needs an *immediate* transfer to CMC." *See* Defs.' Ex. AO, medical chrono dated Feb. 24, 1999 (emphasis added). Dr. Pickett had arranged with the Chief Medical Officer ("CMO") for the California Men's Facility

("CMC"), a CDC facility that had an acute care hospital, to accept Plaintiff. *Id., see also* Defs.' Ex. AP, Declaration of Charles Pickett, MD, at ¶ 5. Dr. Pickett frequently entered into "CMO to CMO" agreements to send Centinela patients to CMC for medical treatment. *See* Picket Decl. at ¶ 6. However, Plaintiff was not permitted to transfer to CMC due to custody concerns. *See* Holmstrom Decl. at ¶ 10.

On February 25, 1999, Plaintiff appeared before the ICC classification committee, including Defendants Gile, Favila, Alkire and Esquibel, at which time Defendants took note of Dr. Pickett's medical chronos seeking immediate transfer for Plaintiff due to his medical concerns. *See* Defs.' Ex. AQ, classification chrono dated February 25, 1999. According to this chrono, Defendant Holmstrom [5] "direct[s] Centinela to refer [Plaintiff] for transfer" to the Corcoran SHU. However, the committee elected to retain Plaintiff at Centinela until the case was referred to the classification staff representative ("CSR") who would then decide to transfer Plaintiff to either Corcoran or Pelican Bay State Prison ("Pelican Bay"). *Id.* Pelican Bay does not have an on-site acute care hospital. *See* Defs.' Ex. AC, Pickett Deposition at 24:25–25:15.

On March 10, 1999, the CSR approved Plaintiff's nine month SHU term. *See* Defs.' Ex. AR, classification chrono dated March 10, 1999. However, Plaintiff's transfer was, once again, deferred due to lack of paperwork. *Id.* Dr. Pickett wrote yet another medical chrono in which he stated that Plaintiff needed an *"immediate* transfer to CMC." *See* Defs.' Ex. AS, medical chrono dated March 15, 1999 (emphasis added). He when on to further note that Plaintiff "has severe erosion and gastric ulcers with possible lymph node mat-

---

**5.** The chrono refers to "Holmstead" but Defendants have indicated that this is a misspelling and it should be "Holmstrom."

ting." *Id.* Plaintiff appeared again before Defendants Ryan, Favila and Asuncion at his ICC classification hearing. *See* Defs.' Ex. AT, classification chrono dated March 22, 1990. At this classification hearing, the committee elected to continue to retain Plaintiff at Centinela until a transfer could be made to either Corcoran or Pelican Bay. The CSR followed up with an endorsement to transfer Plaintiff to Corcoran. *See* Defs.' Ex. AU, classification chrono dated March 25, 1999.

Plaintiff was actually transferred to Corcoran nearly forty five (45) days later and five months after Dr. Pickett's first medical chrono recommending a transfer to an institution with hospital facilities that was not available at Centinela. *See* Defs.' Ex. B. On April 14, 1999, Plaintiff was examined by Dr. Robertson, the staff gastroenterologist at Corcoran. *See* Defs.' Ex. AW, medical report dated April 14, 1999. Approximately one week later, Dr. Robertson performed an EGD and determined that Plaintiff had a large chronic duodenal ulcer, gastric erosions and a minimal hiatus hernia which produces acid reflux. *See* Defs.' Ex. AX, Operative Report dated April 20, 1999. Dr. Robertson also reported that Plaintiff's that "consideration for a surgical opinion will be considered in view of thus far medical treatment failure of the ulcer, although clearly he appears to have had significant improvement in the esophagus." *Id.*

As a result of the testing performed, Dr. Robertson referred Plaintiff to Dr. Calvin Schuster, a general surgeon on contract with the CDC, to determine where surgery should be performed. Dr. Schuster first examined Plaintiff on April 28, 1999. *See* Defs.' Ex. AZ, Physician's Progress Notes. Dr. Schuster noted in the examination that Plaintiff "continues [with] much pain." *Id.* Plaintiff underwent surgery several months later on August 4, 1999 and Dr. Schuster removed half of Plaintiff's stomach. *See* Defs. Ex. BC, Physician's Progress Notes. According to Defendants, the delay in time between the recommendation for surgery and surgery itself, "caused no *additional* substantial physical harm to Plaintiff." *See* Defs.' SOF 118 (emphasis added). Plaintiff was later transferred to High Desert State Prison.

## IV.

### Evidentiary Objections

Defendants have made evidentiary objections to nearly every one of Plaintiff's "Statement of Undisputed Material Facts and Opposition to Defendants Statement of Undisputed Material Facts." *See* Defs.' Reply at 2–15. A majority of the fourteen pages of objections by Defendants fail to cite to any legal authority or evidentiary basis for these objections. Specifically, Defendants have not provided an evidentiary basis to their objection to Plaintiff's SOF Nos. 10, 13, 15, 16, 17, 21, and 22. Therefore, these objections are overruled. Further, the Court overrules Defendants' relevancy objections to Plaintiff's SOF Nos. 27, 28, 29, 21, 33 and 34. *See Hollingsworth Solderless Terminal Co. v. Turley,* 622 F.2d 1324, 1335, fn. 9 (9th Cir. 1980). The Court also notes that Defendants object to Plaintiff's submission of exhibits, which include Plaintiff's CDC medical files, on the grounds that these documents "lack foundation." These objections are baseless for two reasons. First, Defendants submit many of the same documents in their own list of exhibits. Second, Defendants have informed the Court that the parties have stipulated that "all documents from Defendant CDC's files are authentic." *See* Defs.' First Amended Separate Statement of Undisputed Material Facts ("SOF") at 1.[6] Thus,

---

**6.** Defendants have filed an "Amended" Separate Statement of Undisputed Facts. For the

the Court overrules Defendants objections to Plaintiff's exhibits on the grounds that they "lack foundation."

Finally, Defendants also object to Plaintiff's citation to the expert report of Dr. Konow. Defendants argue that Dr. Konow's expert report is not sworn testimony and therefore, is inadmissable pursuant to FED.R.CIV.P. 56(e). However, Defendants have included in their exhibits a portion of the deposition transcript of Dr. Konow. *See* Defts.' Ex. AA, Deposition of Audrey Konow, M.D. Although only a portion of the deposition transcript is before the Court, Defendants have included a copy of the "Witness's Certificate," in which Dr. Konow has signed the deposition transcript under penalty of perjury. *Id.* Moreover, there are several questions posed by defense counsel, in the portions of the deposition testimony provided to the Court, in which Dr. Konow is asked the basis of her opinion set forth in her report. Defendants argue that Dr. Konow's report "lacks foundation to the extent that no factual record is attached to substantiate her statements." *See* Defs.' Reply at 4. In the report, Dr. Konow indicates that she relied on Plaintiff's CDC medical records in forming her opinions, describes his medical condition and opines as to the quality of care that he has received from prison officials. *See* Pl.'s Ex. DDD, Expert Report of Audrey Konow, M.D. at 4. Therefore, Dr. Konow has adequately stated the factual basis for her opinion and the report is admissible for the purposes of summary judgment pursuant to FED.R.CIV.P. 56(e). *See Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1317–1318 (9th Cir.1985).

sake of clarity, the Court will cite to this document [Doc. No. 116], as Defendants

## V.

### Motion for Summary Judgment per FED.R.CIV.P. 56(c)

Defendants seek summary judgment on the grounds that there are no genuine issues of material facts to support Plaintiff's Eighth Amendment deliberate indifference claim, and regardless of any violation, that they are entitled to qualified immunity. Defendant CDC argues that they are entitled to summary judgment as to Plaintiff's ADA claims because it is partially barred by the statute of limitations and no genuine issue of material fact supports Plaintiff's ADA claim. Further, Defendant Holmstrom argues that Plaintiff's claims against her are barred by the applicable statute of limitations. Finally, Defendant CDC moves for summary judgment regarding Plaintiff's claims for declaratory relief as he is no longer incarcerated by the CDC.

### A. Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. FED. R.CIV.P. 56(c). The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party must identify the pleadings, depositions, affidavits, or other evidence which the moving party "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties'

"SOF."

differing versions of the truth." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir.1982).

The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. To successfully rebut a properly supported motion for summary judgment, the nonmoving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the plaintiff[ ]'s favor, could convince a reasonable jury to find for the plaintiff[ ]." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir.2000) (citing FED.R.CIV.P. 56; *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548).

### B. Statute of Limitations

#### 1. *Defendant Holmstrom*

■ Defendant Holmstrom argues that Plaintiff's cause of action against her is barred by the applicable statute of limitations. While Congress has provided no federal statute of limitations governing section 1983 claims, the Supreme Court has held that federal courts should use the forum state's single most appropriate statute of limitations applicable to personal injury actions for all section 1983 claims. *See Wilson v. Garcia*, 471 U.S. 261, 269, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Relying on *Wilson*, the Ninth Circuit has found that the one-year statute of limitations of California Code of Civil Procedure § 340(c)[7] is the most appropriate. *Usher v. City of Los Angeles*, 828 F.2d 556, 558 (9th Cir.1987); *Trimble v. City of Santa*

*Rosa*, 49 F.3d 583, 585 (9th Cir.1995) (per curiam). Federal law, however, determines when a section 1983 cause of action accrues. *Hardin v. Straub*, 490 U.S. 536, 543–44, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989). Under federal law, a claim generally accrues when the plaintiff "knows or has reason to know of the injury which is the basis of the action." *Elliott v. City of Union City*, 25 F.3d 800, 802 (9th Cir.1996) (internal citations omitted).

Plaintiff first named Holmstrom as a Defendant in this action on August 1, 2002 in his First Amended Complaint. [Doc. No. 56]. The claim against Defendant Holmstrom arises out of her recommendation that Plaintiff should be transferred to Corcoran at his February 25, 1999 classification hearing. *See* Defs.' Ex. AQ. Plaintiff does not dispute Defendants' assertion that Plaintiff was present at this hearing. Therefore, the Court finds that for the purposes of the statute of limitations, Plaintiff's cause of action against Defendant Holmstrom began to accrue on February 25, 1999. This is the date when Plaintiff became aware that Defendant Holmstrom had made the recommendation to transfer Plaintiff to Corcoran rather than to CMC. *See Elliott*, 25 F.3d at 802.

Therefore, Plaintiff must have named Defendant Holmstrom in this action no later than February 25, 2000 in order to be within the time permitted by the statute of limitations, unless the statute of limitations was tolled for a period of time. Plaintiff's action is tolled for a period of two years. *See* CAL. CODE CIV. P. § 352.1 (tolling stat-

---

7. California Code of Civil Procedure § 340(c) provided a one-year statute of limitations on any civil action for "[l]ibel, slander, assault, battery, false imprisonment, seduction, injury or death from wrongful act or neglect ...." CAL. CIV. PROC. CODE § 340(c). On January 1, 2003, this code section was replaced with § 335.1 which now provides for a two-year statute of limitations on these actions.

Plaintiff's claims arose in 1998 prior to the enactment of § 335.1 and therefore, § 335.1 cannot be applied retroactively to Plaintiff's action. *See Maldonado v. Harris*, 370 F.3d 945 (9th Cir.2004) (an extension of a statute of limitations will not apply to claims already barred under the prior statute of limitations unless the Legislature explicitly provides otherwise).

ute of limitations "for a maximum of 2 years" during a prisoner's incarceration); *Fink v. Shedler*, 192 F.3d 911, 916 (9th Cir.1999) (finding that Plaintiff does not allege any facts to suggest how or why California's one-year statute of limitations might be tolled for a period of time which would make his claims timely.) Pursuant to *Fink*, Plaintiff's claims, accruing in 2000, would be tolled for two years. California's one-year statute of limitations would then begin to run—requiring Plaintiff to file this action no later than February 25, 2002.

However, if the First Amended Complaint "relates back" to the original complaint, Plaintiff's claims against Holmstrom would be timely. The Ninth Circuit has held that California law governs the question of when the naming of a defendant in a subsequent complaint relates back to the filing of the original complaint. *See Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1464 (9th Cir.1988), *opinion vacated*, 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989), *and reinstated*, 886 F.2d 235 (9th Cir.1989).

Under California law, "it is settled that a defendant sued by a fictitious name and later brought into the case by an amendment substituting his true name is considered a party to the action from its commencement for purposes of the statute of limitations." *Austin v. Massachusetts Bonding & Ins. Co.*, 56 Cal.2d 596, 600, 15 Cal.Rptr. 817, 364 P.2d 681 (Cal.1961); *see also* CAL. CIV. PROC. CODE § 474 (providing for suit against defendants designated by fictitious names).

■ When Holmstrom was added as a Defendant in the First Amended Complaint, she was not substituted in as a fictitious defendant previously named. Rather, she was added as an entirely new defendant, as a review of the fictitiously named Defendant reveals. Plaintiff named a "Sergeant John Doe" in his original

Complaint. *See* Pl.'s Orig. Compl. at ¶ 33. The description of the actions of Sergeant John Doe Defendant and his position at Centinela is not consistent with the allegations against Holmstrom in the First Amended Complaint. It is clear that this Doe defendant was not intended to be Holmstrom. Thus, in the First Amended Complaint, Holmstrom was added as a new defendant and not substituted as a fictitious defendant previously named. *See Anderson v. Allstate Ins. Co.*, 630 F.2d 677, 683 (9th Cir.1980) ("Under California law, if a defendant is added to an amended complaint as a new defendant, and not as a Doe defendant, the amendment does not relate back to the time of the original complaint."). Accordingly, Plaintiff is not entitled to take advantage of California Code of Civil Procedure § 474 and the relation-back doctrine.

Because Plaintiff's section 1983 claim against Holmstrom does not relate back to the original complaint, those claims are barred by the one-year statute of limitations and the Court **GRANTS** Defendant Holmstrom's Motion for Summary Judgment.

**2. *California Department of Corrections***

■ The Court finds that California's one-year statute of limitations for personal injury actions is also the appropriate limitation period for Plaintiff's claims under the ADA. *See Soignier v. American Bd. of Plastic Surgery*, 92 F.3d 547, 551 (7th Cir.1996) (finding that, as an action for "fundamental injury to the individual rights of a person," a claim under the ADA is best characterized for statute of limitations purposes as a claim for personal injury), *cert. denied*, 519 U.S. 1093, 117 S.Ct. 771, 136 L.Ed.2d 716 (1997); *Baker v. Board of Regents of the State of Kansas*, 991 F.2d 628, 631 (10th Cir.1993) (charac-

terizing a claim under the Rehabilitation Act as a claim for personal injury for statute of limitations purposes); *Alberti v. City and County of San Francisco Sheriff's Dep't*, 32 F.Supp.2d 1164, 1172 (N.D.Cal.1998) (finding that California's one-year statute of limitations for personal injury actions applies to ADA claim).

Defendant CDC argues that Plaintiff's claims arising prior August 2, 1999 are barred by the applicable statute of limitations.[8] Plaintiff first named the CDC as a Defendant in his First Amended Complaint filed on August 1, 2002. Plaintiff argues that his claims based on events that occurred prior to August 2, 1999 are not time barred because the "CDC's failure to accommodate [Plaintiff's] disability constitutes a continuing violation of the ADA." *See* Pl.'s Opp'n at 9. "The continuing violations doctrine extends the accrual of a claim if a continuing systems of discrimination violates an individual's rights 'up to a point in time that falls within the applicable limitations period.'" *Douglas v. California Dep't of Youth Authority*, 271 F.3d 812, 822 (9th Cir.2001) (citation omitted). The Supreme Court in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) held, reversing the Ninth Circuit in part, that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* However, the Supreme Court did not directly overrule the second part of the continuing violations doctrine in which a plaintiff may establish a continuing violation if they show "a systematic policy or practice of discrimination that operated, in part, within the limitations period." *Id.* at 107, 122 S.Ct. 2061.

Here, the Court finds that Plaintiff has not been able to show a "systematic policy or practice of discrimination" that would allow him to proceed on claims against the CDC that are time barred. To support Plaintiff's argument that the Court should apply the continuing violations argument, Plaintiff points to the instructions of Dr. Hamdy to avoid certain foods. Plaintiff also claims that he informed prison officials on numerous occasions that he could not eat the food that was offered at the prison facilities. *See* Pl's Opp'n at 10. However, the actions Plaintiff complains of are "discrete acts" that are not saved by the continuing violations doctrine. *See Morgan*, 536 U.S. at 102, 122 S.Ct. 2061. Plaintiff has failed to specifically identify a systematic policy of discrimination operated by the CDC. Thus, Defendants' Motion for Summary Judgment on statute of limitations grounds, barring all claims against the CDC prior to August 2, 1999, is **GRANTED.**

**C. Eighth Amendment Deliberate Indifference to Serious Medical Need Claims**

■ Prison officials violate a prisoner's Eighth Amendment right to be free from cruel and unusual punishment if they are deliberately indifferent to his serious med-

---

**8.** Defendant CDC did not assert a statute of limitations affirmative defense in its Answer to Plaintiff's Second Amended Complaint. However, the Court may allow an affirmative defense to be raised for the first time on a motion for summary judgment, provided the opposing party is not prejudiced or unfairly surprised. *See Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir.1993). Plaintiff claims this defense was not raised until discovery was closed in this matter. *See* Pl.'s Opp'n at 9, fn. 5. Defendant CDC placed Plaintiff on notice regarding this affirmative defense in its Opposition to Plaintiff's Motion for Leave to Amend Complaint [Doc. No. 52]. Plaintiff had the opportunity to conduct discovery on this affirmative defense. Thus, the Court finds there to be no prejudice to Plaintiff to allow Defendants to address this affirmative defense in their Motion for Summary Judgment.

ical needs. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir.1989). To state a constitutional claim for deliberate indifference to a serious medical need, the prisoner must first demonstrate the existence of a serious medical condition of which the prison officials should have been aware. *Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285; *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997). A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104, 97 S.Ct. 285. Thus, the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin*, 974 F.2d at 1059–60.

"In order to show deliberate indifference, an inmate must allege sufficient facts to indicate that prison officials acted with a culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 302, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The prisoner must show that the defendant purposefully ignored or knowingly failed to respond to his pain or medical need in order to establish deliberate indifference. *McGuckin*, 974 F.2d at 1060. The indifference to medical needs also must be substantial; inadequate treatment due to malpractice, or even gross negligence, does not amount to a constitutional violation. *Estelle*, 429 U.S. at 106, 97 S.Ct. 285; *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.1990). Further, a finding that the defendants' neglect of a prisoner's condition was an "isolated occurrence," *id.*, or an "isolated exception," *Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir.1986), to the defendants' overall course of treatment of the prisoner ordinarily militates against a finding of deliberate indifference. *McGuckin*, 974 F.2d at 1060.

In sum, a deliberate indifference determination requires focus on the seriousness of the prisoner's medical needs and the nature of the defendants' response to those needs. *Id.* at 1059. While differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim, *see Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989), specific allegations which show the prison officials intentionally ignored or otherwise interfered with a doctor's order or medical plan may. *See Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285 (deliberate indifference may be manifest where guards "intentionally interfere with treatment once prescribed"); *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) (prison officials act with deliberate indifference by ignoring the instructions of a prisoner's treating physician); *Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir.1970).

Here, Defendants do not dispute that Plaintiff has adequately shown a serious medical need. *See* Defs.' Ps & As at 6. Accordingly, the Court must look to whether Defendants acted with deliberate indifference to Plaintiff's serious medical needs in violation of his Eighth Amendment rights.

### 1. *Committee Member Defendants*

In support of his claims of deliberate indifference, Plaintiff contends that, despite the three medical chronos written by Dr. Pickett urging transfer of Plaintiff to an institution with a qualified medical hospital, Defendants failed to transfer Plain-

tiff for more than five months, causing Plaintiff to suffer substantial pain.

First, Defendants Esquibel, Asuncion, Alkire, Ryan, Gile, Favila and Valenzuela[9] contend that they were not deliberately indifferent to Plaintiff's serious medical needs because they are not authorized to transfer inmates. *See* Defs.' SOF Nos. 19–20. To support their argument they claim that classification committee members can only "make a recommendation to a CSR [Classification Staff Representative], who makes the final determination on whether and when an inmate should be transferred." *See* Defs.' Ps' & As at 7.

Dr. Pickett, on three separate occasions, stated that Plaintiff needed an immediate transfer to a medical facility. On November 4, 1998, Dr. Pickett wrote a medical chrono stating "[Plaintiff] has moderate to severe erosion of the gastric mucosa and espohageal erosion from reflux, due to a hiatal hernia" and went on to state that "[Plaintiff] needs a transfer to an institution with [ ] medical hospital facilities." *See* Defs.' Ex. AB, medical chrono dated Nov. 4, 1998. Plaintiff appeared before the classification committee two days later. *See* Defs.' Ex. AD. During this hearing, Plaintiff informed Defendants Asuncion and Esquibel of his need to transfer to an institution with a medical hospital pursuant to Dr. Pickett's chrono. *Id.* Instead of recommending a transfer, Defendants Asuncion and Esquibel chose to refer Plaintiff's request to the CSR. *Id.*

On February 11, 1999, Plaintiff was given a nine month SHU term. Again, Defendants had Plaintiff's C-file which contained Dr. Pickett's medical chrono. However, they elected to retain Plaintiff in Ad–Seg at Centinela "pending review" for placement at Pelican Bay or Corcoran. *See* Defs.' Ex. AN. As stated above, Defendants admit that Pelican Bay did not have an onsite acute care facility. *See* Defs.' AC. On February 24, 1999, Dr. Pickett issued another medical chrono in which he stated that "[Plaintiff] needs an *immediate* transfer to CMC." *See* Defs.' Ex. AO (emphasis added). Dr. Pickett has indicated in his declaration that he recommended this transfer because he believed that Plaintiff needed to be treated at an acute care hospital. *See* Pickett Decl. at ¶ 5. The next day, Plaintiff appeared before the classification committee. *See* Defs.' Ex. AQ. The classification committee, while taking note of the medical chronos and Holmstrom's recommendation to transfer Plaintiff to Corcoran, elected to retain Plaintiff at Centinela until the case was referred to the CSR. *Id.* Dr. Pickett wrote a third medical chrono on March 15, 1999, again stating that Plaintiff needed an "immediate" transfer to CMC due to his "severe erosion and gastric ulcers." *See* Defs.' Ex. AS. Plaintiff again appeared before the classification committee who elected to continue to retain Plaintiff at Centinela until the transfer to Corcoran or Pelican Bay could be made. *See* Defs.' Ex. AU. Plaintiff was ultimately

---

**9.** Defendants Alkire, Esquibel and Valenzuela argue that they are entitled to summary judgment because they "merely presented his case factors to the [classification committee] to decide appropriate housing and program placement." *See* Defs.' Ps & As at 11. However, Defendants provide the Court with no evidence or legal authority which would support the claim that these Defendants are somehow less responsible for the alleged constitutional violations simply because they are correctional counselors. Further, Defendants admit that Defendants Alkire, Esquibel and Valenzuela were responsible for reviewing Plaintiff's central file, which included Dr. Pickett's medical chronos, and presenting Plaintiff's "case factors to the committee for the committee to determine if the inmate is appropriate housed." *See* Defs.' SOF No. 25. Accordingly, the Court finds there is no merit to this argument.

transferred to Corcoran on March 25, 1999.

Each time Plaintiff appeared before the classification committee, these Defendants had access to his C-file which contained medical chronos specifying an urgency on the part of Dr. Pickett to transfer Plaintiff to a CDC acute care medical facility.[10] Defendants who were on Plaintiff's classification committee argue that they had no responsibility for the failure to timely transfer Plaintiff to a proper medical facility. However, CAL. CODE REGS., tit. 15, § 3379(a)(1) provides, in part, that "any inmate transfer from a facility other than a reception center *shall* require a classification committee action and endorsement by a classification staff representative. (CSR)." It is clear from this regulation that an action to request transfer for an inmate must be made by the classification committee before it can be endorsed by a CSR. There is no evidence before this Court to demonstrate that any of the Defendants provided the CSR with the information needed to transfer Plaintiff to a medical facility. Further, the Defendants repeatedly recommended that Plaintiff be sent to Administrative Segregation at Centinela without any regard to the need to send him a medical facility.

Defendants argue that they cannot be held accountable because they are not the final "arbiters" with regard to Plaintiff and Dr. Pickett's transfer requests. *See* Defs.' Ps & As at 7. For this proposition, Defendants cite to *Doe v. Lebbos,* 348 F.3d 820, 831 (9th Cir.2003) in which the Ninth Circuit affirmed summary judgment for a defendant where there was no evidence that the defendant was the final decision maker

for the defendant county and thus, there was no basis for the plaintiff's *Monell* claim against the county they were suing. The *Lebbos* case stands for an entirely different principle of law than what is presented in the case currently before this Court. The Supreme Court held in *Monell* that a municipality may be held liable under section 1983 for monetary, declaratory, or injunctive relief where the plaintiff alleges facts sufficient to show that his constitutional rights were denied through the implementation or execution of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). There is no *Monell* claim before this Court. Plaintiff is not seeking to hold a municipality liable for the alleged constitutional violations.

Despite the numerous medical chronos by Dr. Pickett indicating that Plaintiff needed an immediate transfer to an acute care facility, Defendants virtually ignored these requests. For several months Defendants recommended that Plaintiff either be retained in Administrative Segregation at Centinela until they recommended that Plaintiff be transferred to either Pelican Bay or Corcoran on February 11, 1999. *See* Defs.' Ex. AN. Further, the repeated recommendations to transfer Plaintiff continued to include a recommendation to send him to Pelican Bay or Corcoran. The fact that the Defendants were considering a transfer to Pelican Bay indicates that they were not concerned with, or failed to consider, Plaintiff's medical needs given

---

**10.** Defendants argue that Plaintiff was not entitled to a transfer to CMC even though that was the facility specified by Dr. Pickett in his medical chronos. Defendants are correct. Prisoners have no constitutional right to incarceration in a particular institution. *Olim v. Wakinekona,* 461 U.S. 238, 244–48, 103

S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). However, the real issue is not whether Plaintiff should have been transferred to CMC but whether Plaintiff should have been transferred to *any* CDC facility that had an acute care hospital.

that Pelican Bay does not have an on-site acute care hospital. *See* Defs.' SOF No. 35. At the February 11, 1999 hearing, when Plaintiff attempted to address his medical concerns, the classification committee simply referred him to the Centinela medical department which all parties acknowledge was not capable of addressing his serious medical needs. *See* Defs.' Ex. AN. In order for a CSR to endorse a transfer recommendation, that recommendation would first have to be made by the classification committee. *See* CAL. CODE REGS., tit. 15, § 3379(a)(1). The record does not reflect a recommendation by Defendants to transfer Plaintiff to a medical facility until February 25, 1999 and only after Dr. Pickett had written three medical chronos indicating Plaintiff's need for an immediate transfer to a facility that had an acute care hospital. *See* Defs.' Ex. AQ. Further, the classification chronos prior to February 25, 1999 fail to show any discussion by the Defendants of Plaintiff's medical reasons for transferring to a facility that could provide him with the proper medical attention.

It also appears from the record that there is a triable issue of material fact regarding whether Plaintiff suffered from a substantial amount of pain due to Defendants delay in transferring Plaintiff to a medical facility. Dr. Goldberg, testifying on behalf of the Defendants, stated that the delay caused Plaintiff no additional physical harm or pain beyond the pain Plaintiff was already experiencing. *See* Defs.' Ex. Y, Deposition of Norman J. Goldberg, M.D. at 92. However, Plaintiff's expert, Dr. Konow, testified that Plaintiff suffered from extreme anxiety over his condition. She further testified that Plaintiff also suffered from "extreme abdominal pain" prior to having the surgery. *See* Pl.'s Ex. EEE, Konow Depo. at 254–55. The record before the Court shows that Defendants were aware of a risk of serious injury to Plaintiff when they denied him

transfer to a licensed hospital for a period of five months. *See Clement v. Gomez,* 298 F.3d 898, 905 (9th Cir.2002).

Accordingly, the Court finds there to be a triable issue of material fact regarding whether Defendants Esquibel, Asuncion, Alkire, Ryan, Gile, Favila and Valenzuela were deliberately indifferent to Plaintiff's serious medical needs in violation of Plaintiff's Eighth Amendment rights. Thus, Defendants Esquibel, Asuncion, Alkire, Ryan, Gile, Favila and Valenzuela's Motion for Summary Judgment on Eighth Amendment grounds is **DENIED**.

### 2. *Defendant Garcia*

Defendant Garcia seeks summary judgment as to Plaintiff's Eighth Amendment claims on the grounds that there is no evidence in the record to show that she ever participated in Plaintiff's classification hearings. However, Plaintiff has testified that he spoke with Defendant Garcia, Warden of Centinela, at his classification hearing in March of 1999. *See* Pl.'s Deposition at 48–49. At this hearing, Plaintiff claims he informed Defendant Garcia that he had a serious medical condition which required a transfer to a medical facility but that the classification committees were ignoring his requests. *Id.* Defendant Garcia told Plaintiff that she would "see what she can do" and Plaintiff believed that Garcia showed compassion for his situation. *Id.* at 50:1–17. Plaintiff was transferred to Corcoran on April 12, 1999. *See* Defs.' Ex. B.

Based on the evidence before the Court relating to Defendant Garcia, the Court finds no genuine issues of material fact exist to show that Defendant Garcia acted with "deliberate indifference" to his serious medical needs to support an Eighth Amendment violation. *See Estelle,* 429 U.S. at 104–05, 97 S.Ct. 285. Thus, Defendant Garcia's Motion for Summary Judgment is **GRANTED**.

### 3. *Defendant Sandham*

■ As to Dr. Sandham, the Court finds that Plaintiff has demonstrated a triable issue of material fact with regard to whether Dr. Sandham acted with deliberate indifference to his serious medical needs.[11] After Plaintiff's surgery, he was transferred to High Desert State Prison ("High Desert") on April 17, 2000. *See* Defs.' Ex. B. In his Second Amended Complaint, Plaintiff alleges Dr. Sandham, a physician at High Desert, was deliberately indifferent to his serious medical needs because he refused to transfer Plaintiff to a facility that could accommodate his dietary requirements. *See* SAC ¶ 44. Plaintiff also alleged that Dr. Sandham denied his request to receive an extra lunch and dietary supplement drinks pursuant to medical chronos that had been issued. *Id.*

Plaintiff's medical records at High Desert, along with the deposition testimony of Dr. Sandham, indicate that Dr. Sandham prescribed Ensure for Plaintiff, a nutritional supplement drink, referred him to the registered dietician and admitted him to the Correctional Treatment Center ("CTC") on more than one occasion. *See* Defs.' Ex. BC; *see also* Deposition of Dr. Richard W. Sandham, M.D. Defendant Sandham also wrote a chrono which allowed Plaintiff to receive additional time to eat. *See* Sandham Depo at 91:5–9.

In support of his claims of deliberate indifference, Plaintiff claims that he should have been permitted to stay in the CTC because he was given the proper diet and allowed a sufficient amount of time to eat. *See* Pl.'s Depo at 137:18–25. Dr. Mericle, a High Desert physician, noted that Plain-

tiff's problem was "he needs more time to eat" and Dr. Mericle went on to note that extra meal time would not be accommodated in general population. *See* Pls' Ex. KK, Physician's Progress Notes dated July 5, 2000. Dr. Mericle also commented that because Plaintiff would probably not receive extra meal time in general population Plaintiff would remain in the CTC until "Dr. Sandham figures out how he can arrange" for Plaintiff to have extra meal time. *Id.* Regardless of Dr. Mericle's concerns, Plaintiff was then released by Dr. Sandham to the general population. Dr. Sandham testified that he wrote discharge orders for Plaintiff indicating that he should receive thirty minutes to eat a meal and correctional officers should provide him with Ensure. *See* Sandham Depo at 47:4–7.

After he was released to general population, Plaintiff claims that CDC staff refused to follow Dr. Sandham's dietary prescription which caused him pain and suffering. *Id.* at 147:4–10, 148:3–8, 150:8–14. Plaintiff filed an administrative grievance claiming that correctional officers in general population were ignoring Dr. Sandham's discharge orders indicating that Plaintiff should receive an extra sack lunch as well as additional meal time given his serious medical needs. *See* Defs.' Ex. BJ, Inmate/Parolee Appeal Form dated March 30, 2001. Dr. Sandham responded to this grievance and denied Plaintiff's request. *Id.*, First Level Appeal Response dated May 8, 2001. Specifically, Dr. Sandham indicated that Plaintiff's request for additional meal time was a "custody issue" even though Dr. Sandham personally wrote the medical

---

11. Defendant Sandham's argument that he entitled to summary judgment pursuant to S.D. CivLR 7.1(f)(3)(c) on the ground that Plaintiff did not dispute that Defendant Sandham is entitled to judgment as a matter of law in his Opposition is not supported by Ninth

Circuit case law. *See Martinez v. Stanford,* 323 F.3d 1178 (9th Cir.2003) (failure of a nonmoving party to comply with a local rule does not excuse the moving party's affirmative duty under Rule 56 to demonstrate its entitlement to summary judgment)

discharge orders indicating that Plaintiff needed extra time to eat his meals to avoid gastrointestinal distress. *Id.*

Thus, based on the evidence supplied by both parties, the Court finds that a triable issue of fact exists to show that Dr. Sandham was deliberately indifferent to Plaintiff's serious medical needs. The record reflects Dr. Sandham made dietary recommendations to prevent Plaintiff from suffering from "dumping syndrome," [12] including but not limited to allowing Plaintiff more time to eat his meals. This was not complied with by correctional staff. Instead of readmitting Plaintiff to the CTC where Plaintiff would have been provided additional time to eat in order to prevent Plaintiff from suffering unnecessary and substantial pain, Dr. Sandham denied Plaintiff's request because it was a "custodial issue." Accordingly, Dr. Sandham's Motion for Summary Judgment is **DENIED.**

### D. Qualified Immunity

■ Defendants move for summary judgment on Plaintiff's Eighth Amendment claims on the ground that they are entitled to qualified immunity. Qualified immunity entitles government officials to "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis original). The defense of "qualified immunity" protects "government officials ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This standard " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); *Jeffers v. Gomez,* 267 F.3d 895, 909 (9th Cir.2001); *Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.").[13]

### 1. *Saucier's* "Threshold Inquiry"— Violation of a Constitutional Right

Under *Saucier,* the district court must first determine whether, "[t]aken in the light most favorable to the party asserting the injury ... the facts alleged show the officer's conduct violated a constitutional right." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. "Although a defendant's subjective intent is not relevant to the qualified immunity defense, his mental state is relevant where it is an element of the alleged

**12.** Dr. Sandham testified that Plaintiff was diagnosed with "dumping syndrome" which occurs after a gastrecotomy and is an intolerance to the bulk of food which results in "vomiting and distress from eating too much too fast." *See* Sandham Depo at 79:3–12. One way of treating dumping syndrome is to eat more slowly. *Id.*

**13.** The affirmative defense of qualified immunity does not extend to claims for declaratory or injunctive relief. *Keenan v. Hall,* 83 F.3d 1083, 1093 (9th Cir.1996) (citing *American Fire, Theft & Collision Managers, Inc. v. Gillespie,* 932 F.2d 816, 818 (9th Cir.1991)); *see also Wood v. Strickland,* 420 U.S. 308, 314 n. 6, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."). Here, however, Plaintiff's claims for injunctive relief are moot and only those for damages remain.

constitutional violation." *Jeffers*, 267 F.3d at 911 (citing *Crawford–El v. Britton*, 523 U.S. 574, 589, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)). When a prisoner's cause of action arises under the Eighth Amendment, the defendant's subjective intent comprises an essential element of the affirmative case. *See Wilson*, 501 U.S. at 303, 111 S.Ct. 2321. Thus, in an Eighth Amendment case like this one, while the court must accept Plaintiff's factual allegations to be true, the assertion of a qualified immunity defense requires him to do more: he must " 'put forward specific, nonconclusory factual allegations' that establish improper motive." *Crawford–El*, 523 U.S. at 598, 118 S.Ct. 1584 (quoting *Siegert v. Gilley*, 500 U.S. 226, 236, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (Kennedy, J., concurring in judgment)); *Jeffers*, 267 F.3d at 911. In *Jeffers*, the Ninth Circuit noted that *Crawford–El* "applied the specificity requirement in reviewing summary judgment on a plaintiff's affirmative case," but found "no principled reason why [the court] should use a different standard in reviewing summary judgment on the affirmative defense of qualified immunity." *Jeffers*, 267 F.3d at 907.

Thus, Plaintiff must allege facts which are both "specific" and "nonconclusory" in support of his claims that Defendants were deliberately indifferent to his serious medical needs in order to demonstrate as a matter of law, that the Eighth Amendment has been violated. *See Crawford–El*, 523 U.S. at 598, 118 S.Ct. 1584; *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *Jeffers*, 267 F.3d at 911. If, in answering this threshold question, the Court finds that "no constitutional right would have been violated were [Plaintiff's] allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to re-solving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all.").

As stated above, the Court has found that a triable issue of material facts exists with regard to whether Defendants acted with deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. *See Jeffers*, 267 F.3d at 907; *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285. Therefore, Plaintiff has satisfied *Saucier's* "threshold inquiry".

**2. "Next Sequential Step"—Whether the right was "Clearly Established"**

Because the Plaintiff successfully demonstrated that his constitutional right may have been violated, the Court must now determine whether the right was clearly established. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. The court must undertake its evaluation of whether a right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. In essence, the question is whether the official could have reasonably but erroneously believed that his conduct did not violate the plaintiff's rights. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir.2001); *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

Here, the law governing a prison official's responsibilities to follow a specific doctor's orders under the circumstances was "clearly established" when Plaintiff alleges Defendants ignored orders issued by the prison doctors and failed to transfer

him to a medical facility. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. While *Estelle* sets forth the general proposition that prison officials may not act with "deliberate indifference to serious medical needs," 429 U.S. at 106, 97 S.Ct. 285, *Estelle* itself noted deliberate indifference "is manifested ... by prison guards intentionally denying or delaying access to medical care," 429 U.S. at 104–05, 97 S.Ct. 285, or "intentionally interfere[ ] with treatment once prescribed" by a physician. *Id.* at 105, 97 S.Ct. 285; *see also United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (noting that rights may be "clearly established" sufficient to overcome a defendant's claim of qualified immunity if a "general constitutional rule already identified in the decisional law ... appl[ies] with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.") (citations omitted). Moreover, while "precedent directly on point is not necessary to demonstrate that a right is clearly established," *Giebel v. Sylvester,* 244 F.3d 1182, 1189 (9th Cir. 2001), in the Ninth Circuit, as well as in other Circuit Courts of Appeal, it had been held, even before *Estelle* was decided, that prison officials who know, yet ignore instructions of a prisoner's treating physician, violate the Constitution. *See, e.g., Tolbert,* 434 F.2d at 626; *Martinez v. Mancusi,* 443 F.2d 921, 924 (2d Cir.1970); *White v. Napoleon,* 897 F.2d 103, 106–10 (3d Cir.1990).

"In the specific context of th[is] case, ... it would be clear to a reasonable officer" that denying Plaintiff adequate medical care at a qualified facility and refusing to follow doctor's orders regarding Plaintiff's dietary needs was *unlawful* under the clearly established law discussed above. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Thus, because Plaintiff has offered sufficient evidence that Defendants may have violated his clearly established Eighth Amendment right to adequate medical care, the Court finds that Defendants are not entitled to qualified immunity as a matter of law. Accordingly, Defendants' Motion for Summary Judgment is **DENIED** on qualified immunity grounds.

## E. ADA Claims

Plaintiff's Second Amended Complaint alleges a cause of action under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"). As stated above, Plaintiff's ADA claims are limited to events which occurred after August 2, 1999. Title II of the ADA broadly prohibits discrimination by public entities against individuals with disabilities: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The prohibitions of the ADA apply to state prisons. *See Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 1954, 141 L.Ed.2d 215 (1998); *Armstrong v. Wilson,* 124 F.3d 1019, 1023 (9th Cir.1997).

The Ninth Circuit set out the elements of a claim under Title II of the ADA in *Thompson v. Davis,* 295 F.3d 890 (9th Cir.2002):

To state a claim of disability discrimination under Title II, the plaintiff must allege four elements: (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion,

denial of benefits, or discrimination was by reason of the plaintiff's disability. *Id.* at 895 (citing *Weinreich v. L.A. County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir.1997)).

### 1. Plaintiff's condition constituted a disability

■ Under the ADA, a "disability" is defined as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). It is undisputed that Plaintiff suffered from a physical impairment under the ADA. *See* Defs.' Memo of Ps & As at 19. However, the parties are in disagreement whether Plaintiff's eating requirements can be considered a "major life activity."

In 2003, the Ninth Circuit joined the Second, Seventh and Eighth Circuits in holding that "eating is a major life activity." *See Fraser v. Goodale*, 342 F.3d 1032, 1040 (9th Cir.2003). Defendants argue that the Ninth Circuit narrowly limited the situations in which eating could constitute a major life activity protected by the ADA. The Ninth Circuit, in finding that eating was a major life activity under the ADA, cautioned that "we must carefully separate those who have simply dietary restrictions from those who are truly disabled." *Id.* at 1041. Thus, the Court must look to whether Plaintiff has presented a genuine issue of material fact whether his dietary restrictions "substantially limit the major life activity of eating." *Id.*

Plaintiff argues that the record before the Court demonstrates that Plaintiff, at the very least, required a modification of his diet to avoid the post operative dumping syndrome. Defendants' expert, Dr. Goldberg, testified that one way to avoid dumping syndrome was to have frequent small meals and avoid liquids with meals. *See* Goldberg Depo at 112. Plaintiff has also provided an expert report by Dr. Konow in which she opines, based on Plaintiff's medical records, that he has a "physical impairment which substantially limited his ability to eat normally." *See* Konow Report at 3. Defendants also admit in their moving papers that Plaintiff experienced "occasional vomiting, upset stomach and burning sensation" when he was unable to follow the dietary restrictions set forth by his doctors. *See* Defs. Ps & As at 21. Given Plaintiff's lack of control over the frequency of his meals, the length of time given to eat his meals while incarcerated, and the evidence of pain he suffered as a result of the inability to follow the doctor's orders, the Court finds that Plaintiff has serious dietary restrictions that substantially limits a major life activity. *See Fraser*, 342 F.3d at 1041.[14]

Both parties agree that Plaintiff has met the second element of an ADA claim. Specifically, Plaintiff, at the time of his incarceration with the CDC, was qualified to participate in its food program. *See* Defs.' Ps & As at 24 (citing *Thompson*, 295 F.3d at 895).

### 2. Plaintiff was excluded from the CDC's meal program by reason of his disability

■ The third and fourth element of a Title II ADA claim under *Thompson*, requires the Plaintiff to prove that he was either "excluded from participation in or

---

**14.** Defendants suggest that they cannot be held liable under the ADA because the Ninth Circuit did not decide that eating was a major life activity until 2003 and therefore, there "was no guidance or awareness that Plaintiff was disabled under the law". Defendants go on to state that this is the "functional equivalent of a qualified immunity analysis". *See* Defs.' Ps & As at 26. However, Defendants notably fail to cite to any legal authority for this proposition. Accordingly, the Court declines to address Defendants argument.

denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Id.*

Plaintiff claims that he has been denied "meaningful access" to the CDC's prison food service. *See* Pl.'s Opp'n at 26 (citing *Crowder v. Kitagawa,* 81 F.3d 1480, 1484 (9th Cir.1996)). In support of his claims, Plaintiff cites to his deposition testimony to show that the "CDC did not provide [Plaintiff] with the ability to follow his doctor's orders or to avoid food that caused him significant pain." *Id.* at 27. The record shows that Plaintiff was, at times, not permitted with sufficient time to eat his meals nor was he permitted by correctional officers to eat small frequent meals. *See* Def.'s Ex. BJ, Plaintiff's administrative grievance dated March 30, 2000, *see also* Pl.'s Ex. KK, physician's progress note dated July 5, 2000. Accordingly, the Court finds that Plaintiff has shown that there are triable issues of material fact as to whether Plaintiff has satisfied the third element of his ADA claim.

Finally, Plaintiff claims that he was denied access to the prison's meal program because of his disability. *See Thompson,* 295 F.3d at 895. Defendants argue that the "record is replete with instances in which staff worked tirelessly to accommodate Plaintiff's impairment." *See* Defs.' Ps & As at 26. The Court disagrees. It is true that while Plaintiff was at High Desert he was admitted to the CTC to allow for him to be able to eat properly following his surgery to prevent "dumping syndrome." However, there is also evidence before the Court to show that CDC officials at High Desert may have failed to accommodate Plaintiff even after they were made aware of his disability. While Plaintiff was incarcerated at High Desert State Prison his medical records indicate

prison doctors, including Defendant Sandham, believed that Plaintiff needed a longer period of time to eat his meals to prevent illness following his surgery. *See* Pl.'s Ex. JJ, Physician Orders dated June 27, 2000 and July 4, 2000. One prison doctor who is not a defendant in this matter indicated that Plaintiff needed more time to eat meals but that this "doesn't happen on the yard." *See* Pl's Ex. KK. However, when Plaintiff filed his administrative grievance informing the prison doctors that their orders were not being followed, Dr. Sandham responded to Plaintiff's grievance by informing him that the longer meal times was a "custody issue." *See* Defs.' Ex. BJ. While incarcerated, Plaintiff was under the control of correctional officers who determine the length of time he is given to eat. Given Dr. Sandham's refusal to implement his own medical orders based on "custody" issues, the Court finds that Plaintiff has demonstrated triable issues of material fact as to whether he has satisfied the fourth element of his Title II ADA claim.

### 3. *Plaintiff is entitled to monetary damages under the ADA*

To recover monetary damages under Title II of the ADA, Plaintiff must prove intentional discrimination on the part of the CDC. *See Duvall v. County of Kitsap,* 260 F.3d 1124, 1138 (9th Cir.2001). In *Duvall,* the Ninth Circuit held that the appropriate test for finding intentional discrimination under the ADA is a "deliberate indifference" standard. *Id.* "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* at 1139 (citing *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The first element is satisfied if the public entity has notice that an accommodation is required. *Id.* The second element is satis-

fied if the entity's "failure to act [is] a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.* Under the second element, "a public entity does not 'act' by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodation are reasonable." *Id.*

In this case, the Court finds that Plaintiff may be able to satisfy the first element. On October 28, 1999, Plaintiff filed a "Reasonable Modification or Accommodation Request" pursuant to CAL. CODE REGS., tit. 15, § 3085(a). *See* Defs.' Ex. BG. In this request, Plaintiff described his disability as an "impaired stomach" and requested more time to eat his meals, as well as a request to transfer to a facility that could provide him with proper medical care. *Id.* As previously noted, the CDC did not deny that Plaintiff was disabled or should be provided an accommodation at the time Plaintiff submitted his request. Therefore, there are triable issues of material fact regarding whether the CDC was on notice that an accommodation was required.

Defendants argue that the second element cannot be met because the CDC did not fail to act in response to Plaintiff's request. The Court finds, however, that Plaintiff may also be able to satisfy the second element. The CDC responded to Plaintiff's request with a "partial grant" and found that Plaintiff "appears to be receiving adequate nutrition for his condition" and he "does not require a special diet." *See* Defs.' Ex. BG. However, in their "discussion of findings," Defendants acknowledge that Plaintiff has a medical chrono to be provided with a longer time to eat his meals. *Id.* They also found that the medical staff recommended Plaintiff "eat food in smaller amounts [and] more frequently than [three] big meals a day." *Id.* It is unclear why the ultimate decision

was simply to refer Plaintiff to a dietician, ignoring his concerns that he was not given enough time to eat or allowed to eat more than three meals a day pursuant to the prison doctor's orders. Moreover, prison doctors also expressed concerns that Plaintiff would not be accommodated on the "yard." *See* Pl.'s Ex. KK. In fact, it appears from the record before the Court that Plaintiff may not have been accommodated on the yard. This led to Plaintiff filing another administrative grievance requesting CDC officials to follow the prison doctors instructions. However, this grievance was rejected by Dr. Sandham even though Sandham was the doctor that ordered the accommodation for Plaintiff. There is no evidence of any further investigation conducted by the CDC to consider what accommodation was reasonable. Based on the record before the Court, Plaintiff has shown that there is a triable issue of material fact regarding whether he has satisfied the second element under *Duvall* and thus, may be entitled to recover monetary damages under Title II of the ADA.

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's ADA claims is **DENIED.**

## VI.

### Conclusion and Order

Based on the foregoing, the Court hereby:

1) **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's claims for injunctive relief as moot pursuant to FED.R.CIV.P. 56 [Doc. No. 113–1];

2) **GRANTS** Summary Judgment as to Defendants Holmstrom and Garcia [Doc. No 113–1] and DISMISSES the case as to Defendants Holmstrom and Garcia. The Clerk shall enter judgment for Defendants Holmstrom and Garcia.

3) **GRANTS** Defendant CDC's Motion for Summary Judgment as to Plaintiff's ADA claims which arose prior to August 2, 1999 on statute of limitations grounds pursuant to FED.R.CIV.P. 56 [Doc. No. 113–1];

4) **DENIES** Defendants Esquibel, Asuncion, Alkire, Ryan, Gile, Favila and Valenzuela and Sandham's Motion for Summary Judgment as to Plaintiff's Eighth Amendment claims pursuant to FED.R.CIV.P. 56 [Doc. No. 113–1];

6) **DENIES** Defendants' Motion for Summary Judgment on qualified immunity grounds pursuant to FED.R.CIV.P. 56 [Doc. No. 113–1];

7) **DENIES** Defendants' Motion for Summary Judgment as to Plaintiff's ADA claims pursuant to FED.R.CIV.P. 56 [Doc. No. 113–1].

**IT IS SO ORDERED.**